UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHARLES MARTIN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:13-cv-00048-JD |
| MIGUEL RIVERA, | ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

This is an action against a federal agent for the allegedly excessive force he used in making an arrest. This matter is now before the Court on Defendant Miguel Rivera's motion for summary judgment [DE 68], which has been fully briefed. [DE 69, 72, 73]. For the following reasons, the Court GRANTS the motion and enters judgment in favor of the defendant.

## I. FACTUAL BACKGROUND

Miguel Rivera was an officer of the Fort Wayne Police Department, and was assigned to the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives as a Task Force Officer. [DE 69-2 ¶ 1]. On June 10, 2011, Rivera was at H & H Firearms investigating a "rash of shootings" in the Fort Wayne area that involved a 10 mm handgun. [DE 69-2 ¶ 2]. At approximately 4:25 p.m., Rivera was talking with Mark Van Burk, H & H Firearms' owner, in Van Burk's office about 10 mm ammunition purchases at the store. [DE 69-3 ¶ 2, 3].

During that time, Michelle Catchings entered H & H Firearms, spoke with a clerk, and looked at some ammunition. [DE 69-2 at 9; DE 70] She then left the store without having made a purchase and returned to her car in the parking lot. [DE 69-2 at 9; DE 70] After Catchings left, the clerk informed Van Burke that a woman had looked at 10 mm ammunition and left the store, but was still in the parking lot. [DE 69-3 ¶ 3]. Catchings then re-entered H & H Firearms, walked

directly to the ammunition section, selected a box of 10 mm ammunition, and walked to the counter to purchase it. [DE 69-2 at 10–11; DE 69-3 ¶ 4; DE 70]. Catchings presented Van Burk with an identification card, and Van Burk took the card with him to his office. [DE 69-2 at 11; DE 69-3 ¶ 6; DE 70]. Van Burk told Rivera about the attempted purchase, and they both exited the office. [DE 69-2 at 11; DE 70]. Rivera approached Catchings, showed her his badge, and identified himself as a local police officer and federal agent. [DE 69-2 at 11; DE 70]. Catchings disclosed that she was purchasing the ammunition for her boyfriend who was sitting in her car in the parking lot, so Rivera asked if he could speak with her boyfriend, and she agreed. [DE 69-2 ¶ 2, 11–12; DE 70]

Rivera and Catchings then exited the store and walked to her car. [DE 69-2 ¶ 2, 12; DE 70]. Rivera approached the passenger side of the car from the rear and identified himself to Charles Martin, who was sitting in the front passenger seat. [DE 69-2 ¶ 3, 12; DE 70; DE 71-1 ¶ 3(a)]. When Rivera told Martin that he wanted to talk about the ammunition purchase, Martin began fidgeting with his hands in his lap, so Rivera told Martin to get out of the car. [DE 69-2 ¶ 3; DE 71-1 ¶ 3(a)]. Martin leaned forward and reached under his seat with his left hand, and Rivera heard a "metal on metal sound" that, based on his past experience, he associated with a gun. [DE 69-2 ¶ 3]. Martin then got out of the car and raised his hands, and a bag of marijuana fell on the ground. [DE 69-2 ¶ 4].

Martin started to run past Rivera towards the other side of the parking lot. [DE 69-2 ¶ 4, 12; DE 70]. Rivera yelled at Martin to stop and was able to grab the bottom of Martin's shirt as he passed him. Rivera states that as he tried to grab Martin, he could feel body armor under Martin's shirt. [DE 69-2 ¶ 4]. Martin broke free of Rivera's grasp, but fell to the ground. [DE 69-2 ¶ 4, 12; DE 70]. Martin regained his feet and tried to keep running, but Rivera caught up to

2

him, wrapped his arms around him, and knocked him into the back of a parked car. [DE 69-2 ¶¶ 4, 12; DE 70]. Martin then turned around to face Rivera, at which point Martin's back was against the car and he was standing chest to chest with Rivera. [DE 69-2 ¶ 4, 12; DE 70; DE 71-1 ¶ 3(c)].

About one second later, Rivera punched Martin on the left side of his face, and Rivera punched him again one-to-two seconds later. [DE 69-2 ¶ 4, 12; DE 70; DE 71-1 ¶¶ 2, 3(c)]. The video shows Martin raising his right hand after the second punch. [DE 70]. In total, only about eleven seconds elapsed from the time Martin began running to when Rivera delivered the second punch and Martin raised his hand in surrender. [*Id.*] Rivera then began performing a pat-down search, and turned Martin around and placed him face down on the trunk of the car. [*Id.*] Catchings had walked towards Martin and Rivera but then returned to her car, so while Rivera was holding Martin on the car, he turned around to order Catchings to get away from her vehicle in order to preserve the evidence. [DE 69-2 ¶ 4, 12; DE 70].

Around this time, a customer leaving the store saw the altercation and alerted the people inside, so Van Burk ran out of the store towards Martin and Rivera. [DE 69-3 at ¶ 8; DE 70]. As Van Burk reached them, Rivera was lowering Martin to the ground, but they lost their balance and fell into Van Burk and to the ground. [*Id.*] Van Burk then sat on top of Martin to restrain him while Rivera went to get his handcuffs and briefly looked around Catchings' car. [*Id.*] When Rivera returned about a minute later, he placed Martin in handcuffs and they waited for additional police officers to arrive. [*Id.*] After handcuffing Martin, Rivera noticed an abrasion on Martin's face. [DE 69-2 at ¶ 5]. He asked Martin if he wanted to receive medical attention, but Martin "stated no and physically refused any medical attention." [*Id.*]

Martin initiated this matter by filing a complaint on February 20, 2013, asserting a § 1983 claim against Rivera for the excessive use of force in violation of the Fourth Amendment. However, Martin later amended his complaint to assert a *Bivens* claim instead of a § 1983 claim. Martin also asserted state law claims against Van Burk and H & H Firearms, but the parties subsequently stipulated to the dismissal of those claims, so only the *Bivens* claim against Rivera remains at issue.

## II. STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006); *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986);

*Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). In addition, since the parties have submitted a video recording of the incident, the Court need not credit a version of the facts that conflicts with any facts that are clearly portrayed in the recording, as there can be no "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where the footage is not clear, though, or where the parties disagree about a fact external to the videotape or an inference to be drawn therefrom, the usual deference to the non-movant applies. *See id.*

### III. ANALYSIS

Martin claims that Rivera violated his rights under the Fourth Amendment by using excessive force against him. This claim arises under *Bivens*, in which the Supreme Court held that a private citizen has an implied right of action to recover money damages for violations of the citizen's Fourth Amendment rights "carried out by virtue of federal authority." *Bivens*, 403 U.S. at 392, 397. Both parties agree that Rivera acted under color of federal law [DE 32 at ¶ 2; DE 65 at ¶ 2], so the dispute centers on whether Rivera violated Martin's constitutional rights, and if so, whether those rights were clearly established.

Rivera has moved for summary judgment, and offers three independent arguments in support: first, that Martin was not seized at the time of the force at issue, so the Fourth Amendment does not apply; second, that even if the Fourth Amendment applies, Rivera's use of force was reasonable; and third, that to the extent Martin's rights were violated, those rights were not clearly established, so qualified immunity shields Rivera from suit. The Court addresses each argument in turn.

**A.    Martin Was Seized at the Time of the Force**

Rivera first argues that Martin's Fourth Amendment claim fails because he was never seized. As applicable here, the Fourth Amendment only protects against unreasonable "seizures," so excessive force can only have violated Martin's rights under the Fourth Amendment if he was

5

seized at the time the force was used. Because Martin's claims arise out of the two punches Rivera threw after he knocked Martin into the back of the car, the relevant question is whether Martin was seized at that point of the encounter.

A seizure "requires *either* physical force *or*, where that is absent, *submission* to the assertion of authority." *Hodari D.*, 499 U.S. at 626 (emphases in original). In a case involving the "use of physical force" a seizure is accomplished "whenever an officer restrains the freedom of a person to walk away, such as by the laying on of hands or other application of physical force," even when the force is ultimately unsuccessful. *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006) ("The fact that the restraint on the individual's freedom of movement is brief makes no difference.") (internal quotations and citations omitted); *see Hodari D.*, 499 U.S. at 626.

Rivera argues that a seizure did not occur here until he handcuffed Martin (which was after he threw the punches, and after Van Burk had restrained Martin on the ground for about a minute), because that was the point at which Martin finally submitted to Rivera's authority and could no longer escape. However, a seizure requires an individual's submission to authority only when the seizure is effected solely by a "show of force," instead of by actual physical force. *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) ("While an officer's application of physical force always constitutes a seizure, a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority."). Where an officer does not simply instruct an individual to stop, but lays his hands on the individual and restricts the individual's movement, a seizure has occurred regardless of whether the individual continues to resist. *Acevedo*, 457 F.3d at 724 (stating that where an officer effects a seizure through the application of physical force, the seizure occurs

"'whenever an officer restrains the freedom of a person to walk away,' such as by the 'laying on of hands or other application of physical force.'" (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) and *Hodari D*, 499 U.S. at 626)). If that individual were to escape, the seizure would not continue during their flight, but that does not change the status of the initial seizure. *Hodari D.*, 499 U.S. at 625; *Acevedo*, 457 F.3d at 724.

Here, Martin was seized at the very latest when Rivera caught him and knocked him against the parked car. This was a physical touching that successfully restrained Martin's freedom of movement, as he was pinned between Rivera and the car and was prevented from continuing his flight. Therefore, regardless of whether Martin continued to resist or might have still escaped, or whether he was still seized during the time Van Burk restrained him on the ground, Martin was seized at the time Rivera threw the punches at issue. *See Acevedo*, 457 F.3d at 724–25 ("[W]here a police officer's use of force causes a man to reel backwards and fall to the ground, a seizure has occurred.").

**B.     Rivera's Use of Force Was Reasonable**

Rivera next argues that even if Martin was seized, the amount of force that he used during the seizure complied with the Fourth Amendment, so Rivera suffered no constitutional injury. The Fourth Amendment prohibits "unreasonable" seizures, which imposes an objective standard, so the sole question is "whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting" him. *Id*. (citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978); *Terry*, 392 U.S. at 21). "An officer's use of force is unreasonable from a constitutional point of view if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009); *see Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). This inquiry also "allow[s] for the fact that police officers are often

forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Several factors inform this inquiry, including (1) the severity of the crime at issue; (2) whether the arrestee poses an immediate threat to the safety of the officer or others; and (3) whether he is actively resisting arrest or attempting to flee and evade arrest. *Graham*, 490 U.S. at 396; *Abbott*, 705 F.3d at 724; *Abdullahi v. City of Madison*, 42.3 F.3d 763, 768 (7th Cir. 2005). All of these factors weigh in Rivera's favor. As to the first factor, Rivera was investigating "a rash of shootings" involving a 10 mm firearm, and he had multiple reasons to suspect that Martin was involved in those crimes—Martin was attempting to acquire 10 mm ammunition through a straw purchaser, he was wearing a bulletproof vest, Rivera had reason to believe that Martin possessed a firearm, and Martin attempted to flee from him. Martin's flight from a law enforcement officer could have constituted an additional offense as well.[1] These are serious and dangerous offenses that justified Rivera in using force to effect Martin's arrest. *See Johnson v. Scott*, 576 F.3d 658, 659–60 (7th Cir. 2009) (holding that this factor weighed in the officer's favor since he was investigating a suspected shooting and the plaintiff had fled from police in a vehicle and then on foot).

The second factor, the threat to the safety of the officer or others, weighs heavily in Rivera's favor. As indicated, Rivera had reason to believe that Martin possessed a gun and that he had been involved in a series of shootings, meaning that he was willing to use it. Martin was also wearing a bulletproof vest, further indicating that he may have anticipated engaging in gunfire. This would have justified a reasonable officer in believing that Martin was armed and

---

[1] Martin also possessed marijuana, but that adds little to the severity of the offense.

dangerous, and any shooting would have posed a serious threat to the safety of Rivera and of the multiple civilians in the area, so it was appropriate to use force in order to avoid these dangers. *Johnson*, 576 F.3d at 660.

The third factor, whether he was actively resisting arrest or attempting to flee and evade arrest, is where Martin focuses his arguments, but this factor weighs in Rivera's favor as well. Martin states that he "was not resisting or fleeing at the time" Rivera struck him. [DE 71-1 ¶ 3(c)]. However, he does not dispute—nor could he, given the video evidence, *Scott*, 550 U.S. at 380–81—that he already fled from Rivera, and that after Rivera initially knocked him down, he rose to his feet and resumed his flight before Rivera knocked him into a parked car. Thus, Martin's argument is essentially that although he initially attempted to flee and evade arrest, he ceased his resistance upon being thrown into the car, just seconds prior to the punches. But even accepting Martin's statement as true, as the Court must in this context, this does not create a material dispute as to whether Rivera's actions were reasonable.

First, Martin never made any outward indication of submission or surrender before Rivera threw the punches. Martin states that after Rivera shoved him into the car, he "put [his] hands up again to show that [he] was surrendering." However, the video shows that Martin did not raise his hands until after Rivera threw the second punch, and Rivera did not throw any more punches after that point. Because Martin's statement on this point is contradicted by a video recording, the Court need not accept it for summary judgment purposes. *Scott*, 550 U.S. at 380–81. Since Martin had not raised his hands or communicated his intent to surrender, Rivera would

9

have been justified in treating him as a resisting and potentially armed suspect, in which case the limited amount of force that he used to subdue Martin was reasonable.[2]

Second, even if Martin did raise his hands or somehow indicate his intent to surrender in the three seconds between when he was knocked into the car and when Rivera struck him, Rivera would not have been required to take Martin's surrender at face value. The Seventh Circuit addressed a similar scenario in *Johnson v. Scott*, where an officer and his German Shepherd were pursuing a suspected shooter who fled from the police. 576 F.3d at 660. The officer and the dog were chasing Johnson, the suspect, on foot, and were only moments behind him when he reached a fence he could not climb. *Id.* at 559. Johnson stopped, turned around, put his hands in the air, and said "I give up." *Id.* Nevertheless, the German Shepherd leapt and bit into Johnson's arm, and the officer knocked him to the ground with his forearm and struck him several more times to subdue him and place him in handcuffs. *Id.*

The Seventh Circuit found that, Johnson's attempt to surrender notwithstanding, the officer's use of force was reasonable. *Id.* While the court noted that "a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders," it emphasized that this "principle depends critically on the fact that the suspect is indeed subdued." *Id.* The court continued, noting that "[n]o law we know of required [the officer] to take Johnson's apparent surrender at face value, a split second after Johnson stopped running." *Id.* Up until that point, Johnson had been trying to escape, the officer had no way of knowing

---

[2] Further, even if Martin did give some indication of surrender, Rivera could have reasonably failed to recognize that surrender in the brief moments between when he pinned Martin up against the car and when he punched him, in which case qualified immunity would apply. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 728 (7th Cir. 2013) (holding that an officer was entitled to qualified immunity where "even assuming that [the plaintiff] had ceased resisting prior to these last three tasings, [the officer] reasonably could have believed that [the plaintiff] had not ceased resisting").

whether Johnson was actually armed, and the officer had only moments after the apparent surrender to assess the situation and act accordingly. Thus, while acknowledging "the unpleasantness of having a German Shepherd clamp onto one's arm or leg," the court found that the force was objectively reasonable. *Id.*

The same is true here. Martin tried to flee from Rivera, continued his flight after being knocked to the ground, and was then pushed against the back of a parked car. Martin then turned around to face Rivera, at which point he was upright, standing chest to chest with Rivera. In this posture, he still had the ability to fight back, and if he could have achieved any separation from Rivera, he could have resumed his flight, as he had already done once. This was still a fluid and uncertain situation, and Rivera had no way of knowing whether Martin would still attempt to flee, whether he was actually armed, or whether, now that Martin was backed into a corner, he would try to fight back. Further, Catchings, who had just tried to make a straw purchase of ammunition for Martin, was still moving about, and could have tampered with the evidence or otherwise interfered with Martin's arrest, so Rivera, who did not have any backup present, had reason to neutralize any threat as quickly as possible. The non-lethal force that Rivera used to do so—two punches, both thrown within seconds of catching Martin—was not unreasonable given these extenuating circumstances.

Martin's initial resistance and flight distinguishes this case from *Holmes*, on which Martin relies. In *Holmes*, the court accepted for the purposes of summary judgment that the plaintiff *never* resisted, and therefore found that it was unreasonable for the officers to put the plaintiff in a wristlock, slam his head against the roof of the car, and grind their knees into his face after he was handcuffed on the ground. 511 F.3d at 685–87. Here, like in *Johnson*, Martin did resist initially, and at the time of the force in question, he had not yet been subdued or

11

neutralized; he was standing chest to chest with the officer after having attempted to flee. Rivera needed to terminate Martin's flight and neutralize the danger Martin posed, and the two punches he threw within seconds of catching up to Martin were reasonable in achieving those results.

Ultimately, Rivera was "forced to make [a] split-second judgment[]—in circumstances that [we]re tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 396–97, and his use of two punches (which, while undoubtedly unpleasant, are a far cry from a German Shepherd's bite), was reasonable under the circumstances. Therefore, the Court concludes that even when drawing all reasonable inferences in Martin's favor, no jury could find that Rivera's use of force was unreasonable under the circumstances. As a result, Martin suffered no constitutional injury, so Rivera's motion for summary judgment must be granted.

**C.     Rivera Is Entitled to Qualified Immunity**

Having found that Rivera did not commit any constitutional violation, it is unnecessary to address at length his final argument, that he is entitled to qualified immunity even if a constitutional violation occurred. However, for the sake of completeness, the Court notes that it would resolve this issue in Rivera's favor as well, as it was not clearly established that using this degree of force against an individual who had only just ceased resisting, and who still had the immediate capability to resist and inflict harm, would violate that individual's rights. In fact, as discussed above, *Johnson* held that a greater use of force in circumstances similar to these did not violate the individual's rights at all. In addition, *Brooks v. City of Aurora, Ill.*, which addressed a similar factual scenario, declined to address the first prong of the qualified immunity analysis, as it found at the second prong that "controlling law would not have communicated to a reasonable officer the illegality of applying pepper spray to an arrestee who has ceased active, physical resistance for a couple of seconds but has not submitted to the officer's authority, has not been taken into custody and still arguably could pose a threat of flight or further resistance."

653 F.3d 478, 487 (7th Cir. 2011). The only case Martin cites to the contrary, *Holmes*, is inapplicable for the reasons discussed above, so he has failed to meet his burden on this issue. Therefore, because Rivera did not violate clearly established law in his use of force against Martin, he would be entitled to summary judgment on qualified immunity grounds as well.

## IV. CONCLUSION

The Defendant's Motion for Summary Judgment [DE 68] is GRANTED. The Clerk of the Court is DIRECTED to enter judgment in favor of Defendant Miguel Rivera.

SO ORDERED.

ENTERED:  July 29, 2014

/s/ JON E. DEGUILIO
Judge
United States District Court